# Exhibit A

## AGREEMENT OF SALE

### 221 Howell Ave Spring Lake, New Jersey

This Agreement of Sale ("Agreement") is entered into as of August 30th, 2023, by and between John Cunningham or a Permitted Assignee ("Buyer"), and John Michael McDonnell Chapter 7 Trustee for the Estate of John M. Reynolds, whose address is 115 Maple Avenue, Red Bank, NJ 07701 ("Seller"). In consideration of the mutual agreements herein set forth, the parties hereto, intending to be legally bound, agree as follows:

1. DEFINITIONS

    1.1 Definitions. Capitalized terms shall have the meanings given them in the body of this Agreement. Additionally, as used in this Agreement, the following terms shall have the meanings set forth below:

    "Agreement" means this document, as amended or supplemented from time to time by documents executed by both Seller and Buyer.

    "Business Day" means any day other than a Saturday, a Sunday, or a legal holiday recognized by the State of New Jersey.

    "Buyer Party" or "Buyer Parties" means Buyer, any Permitted Assignee of Buyer, and any partner or member in, or, as applicable, any shareholder or director of Buyer, or any Permitted Assignee of Buyer, as well as the officers, employees, attorneys, and agents of Buyer or any Permitted Assignee of Buyer.

    "Claim" or "Claims" means any suits, actions, proceedings, investigations, demands, claims, liabilities, fines, penalties, liens, judgments, losses, injuries, damages, expenses or costs, including, without limitation, attorneys' and experts' fees and costs of investigation.

    "Closing Date" means the date on which Closing actually occurs.

    "Closing Documents" means all the documents, other than this Agreement, to be executed and delivered by the parties in order to complete Closing, as specified herein.

    "Due Diligence Period" means the period commencing on the Effective Date of this Agreement and ending at 5:00 P.M. (prevailing Eastern Time) thirty (30) calendar days after the Effective Date, during which period Buyer shall conduct the due diligence activities contemplated by Section 4 of this Agreement.

    "Effective Date" means the date on which or as of which both Buyer and Seller have signed a counterpart of this Agreement.

    "Existing Contracts" means those existing (as of the Effective Date) service, maintenance and operating contracts, equipment leases and similar agreements relating to the operation and maintenance of the Property to which Seller is a party.

"Governmental Authority" means any federal, state, county or municipal government, or political subdivision thereof, any governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court or administrative tribunal.

"Hazardous Materials" means materials, wastes or substances that are (i) included within the definition of any one or more of the terms "hazardous substances," "hazardous materials," "toxic substances," "toxic pollutants" and "hazardous waste" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901, et seq.), the Clean Water Act (33 U.S.C. Section 1251, et seq.), the Safe Drinking Water Act (14 U.S.C. Section 1401, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801, et seq.), and the Toxic Substance Control Act (15 U.S.C. Section 2601, et seq.) and the regulations promulgated pursuant to such laws, (ii) regulated, or classified as hazardous or toxic, under any federal, state or local environmental laws or regulations, (iii) petroleum, (iv) asbestos or asbestos-containing materials, (v) polychlorinated biphenyls, (vi) flammable explosives or (vii) radioactive materials.

"ISRA" means the Industrial Site Recovery Act (N.J.S.A 13:1K-6, et. seq.), as amended and the regulations promulgated pursuant thereto.

"Order" means an order or decree of any Governmental Authority.

"Parties" means Seller and Buyer.

"Permitted Encumbrances" means all of the following, with respect to the Property: (i) liens for real estate taxes and all general and special assessments, a lien not yet due and payable, (ii) present or future laws, ordinances, rules, orders and regulations of any Governmental Authority, including without limitation any terms or conditions of the issuance of any Licenses and Permits, and (iii) encumbrances caused by any Buyer Party.

"Person" means any individual, partnership, corporation, limited liability company, trust or other legal entity.

"Seller Party" or "Seller Parties" means Seller, and any partner or member in, or, as applicable, any shareholder or director of Seller, as well as the officers, employees, attorneys, and agents of Seller.

"Title Insurance Commitment" means a commitment by the Title Company to insure title to the Real Property pursuant to an owner's policy of title insurance in form customary in the jurisdiction in which the Real Property is located, subject only to the Permitted Encumbrances, upon payment of the applicable premium therefor.

"Title Company" means the title company that the Buyer chooses to use for this Sale.

2. PROPERTY

2.1 Property. For the Purchase Price (as defined in Article 3) and subject to the terms and conditions hereof, Seller agrees to sell to Buyer, and Buyer agrees to purchase, all of Seller's right, title and interest in and to the following (the "Real Property"):

**(a)** the parcel land known as 221 Howell Ave, Spring Lake, New Jersey, Block 146 Lot 10, as described on Exhibit "A" attached hereto (collectively with the below parcel referenced in 2.1(b) referred to as the "Land"), together with any and all rights, privileges and easements appurtenant thereto, together with all buildings, improvements and fixtures located thereon (collectively, "Improvements"; the Land, together with the Improvements thereon, collectively referred to hereinafter as the "Real Property"); and

**(b)** to the extent assignable, all leases, licenses, permits, building inspection approvals, certificates of occupancy, approvals, subdivision maps and entitlements, if any, issued, approved or granted by Governmental Authorities in connection with the Real Property (collectively, "Licenses and Permits").

( c ) The buyer and seller acknowledge that no real estate broker/agent procured this transaction and is not entitled to any commission/fee.

3. PURCHASE PRICE

3.1 Purchase Price.

**(a)** The purchase price for the Property is Three Million Four Hundred Thousand Dollars ($3,400,000.00) ("Purchase Price"). The Buyer shall additionally discharge an additional approximately $3,000,000.00 worth of mortgages that the Buyer, or entities owned by the Buyer, currently hold against the property.

**(b)** The Purchase Price shall be paid by Buyer as follows:

(i) Buyer shall deposit in the Buyer's Attorney's Trust Account the sum of One Hundred Thousand Dollars ($100,000.00) at execution of this Agreement and an additional One Hundred Thousand Dollars ($100,000.00) at the end of Due Diligence (such deposit hereinafter referred to as the "Deposit"). The Deposit shall be held in escrow by the Buyer's title company, in a non-interest-bearing account, and disbursed pursuant to the provisions of this Agreement.

(ii) The balance of the Purchase Price over and above the Deposit shall be paid by Buyer, by wire transfer of immediately available funds, to the Title Company for payment to Seller at Closing.

4. DUE DILIGENCE

4.1 Independent Investigation. The Buyer shall have thirty (30) calendar days from the execution of this Agreement to conduct due diligence with respect to the Property, at its sole cost and expense (the "Due Diligence Period"). Buyer shall, during the Due Diligence Period,

inspect and investigate each and every aspect of the Property, either independently or through agents, representatives or experts of Buyer's choosing (collectively, "Buyer's Inspection Agent"), as Buyer considers necessary or appropriate. Buyer's failure to cancel this Agreement at the end of the Due Diligence Period in accordance with Section 4.2 shall conclusively evidence Buyer's complete intention to proceed forward under this agreement. Seller shall cooperate reasonably, at no cost to Seller, with Buyer and Buyer's Inspection Agent in making the Property available for inspection during the Due Diligence Period and thereafter. Notwithstanding anything to the contrary set forth above, Buyer acknowledges and agrees that any documents provided by Seller are solely to facilitate Buyer's investigation into an "AS IS" transaction, and that these provisions shall not constitute any warranty regarding the document or Property or any covenant regarding this transaction.

4.2 Termination During Due Diligence Period.

(a) At any time prior to the expiration of the Due Diligence Period, Buyer shall have the right, in its sole and absolute discretion, and for any or no reason whatsoever, to terminate or continue this Agreement by written notice to Seller received by Seller on or prior to the expiration of the Due Diligence Period. Unless Buyer sends written notification to the Seller of its intentions to cancel this Agreement before the end of the Due Diligence period (the "Cancelation Letter"), time being of the essence, it shall be assumed that Buyer has approved the Property as is and is proceeding forward under this Agreement. Notwithstanding anything to the contrary herein, including but not limited to section 4.4 below, Seller shall have no liability whatsoever to Buyer with respect to any matter disclosed to or actually known by Buyer or its agents prior to the end of the Due Diligence Period so long as the Seller discloses any and all known adverse conditions affecting the title to, or the condition of, the Property.

(b) If Buyer timely send the Cancelation Letter as outlined under this Section 4.2, then the Buyer's Attorney shall return the Deposit to Buyer and the parties shall be released from their obligations under this Agreement, except for obligations which specifically survive termination of this Agreement.

4.3 Completion of Due Diligence. Notwithstanding the foregoing or anything herein to the contrary, Buyer agrees that (i) on or prior to the expiration of the Due Diligence Period, it will have completed its independent investigation of the Property, (ii) Buyer is acquiring the Property based on such independent investigation and subject to all information disclosed to Buyer in any materials provided to or obtained by Buyer, and (iii) except as otherwise expressly set forth in this Agreement, Buyer shall have no right after the expiration of the Due Diligence Period to terminate this Agreement based on any further investigations of the Property. If the Buyer does not send the Cancelation Letter, it shall conclusively established that Buyer has chosen to proceed forward with this transaction.

4.4 As-Is Sale. **If the Buyer elects to proceed with the purchase of the Property following the expiration of the Due Diligence Period, Buyer acknowledges and agrees that the Property shall be sold, and Buyer shall accept possession of the Property on the Closing Date "AS IS – WHERE IS, WITH ALL FAULTS," with no right of setoff or reduction in the Purchase Price, except as otherwise upon in this Agreement, provided the Property is in the same condition as it was at the conclusion of the Due Diligence Period (normal wear and tear**

excepted), and Buyer shall assume the risk that adverse physical, environmental or economic may not have been revealed by Buyer's investigations. Specifically, in furtherance thereof, should Buyer seek or request any reduction/credit from Seller after conclusion of the Due Diligence Period whatsoever, Seller shall have the right to immediately terminate this Agreement by providing written notice thereof to Buyer. Neither Seller, its employees, representatives, counsel, nor any partners, members, officers, directors, employees, trustees, shareholders, principals, parent, subsidiary, affiliate, agent or attorney of Seller, its counsel, nor any other party related in any way to any of the foregoing (collectively, "Seller's Representatives") have or shall be deemed to have made any representations or warranties, express or implied, regarding the Property or any matters affecting the Property, including without limitation the physical condition of the Property, title to or boundaries of the Property, pest control, soil conditions, the presence or absence, location or scope of any Hazardous Materials (as hereinafter defined) in, at, or under the Property, compliance with building, health, safety, land use or zoning laws, other engineering characteristics, traffic patterns and all other information pertaining to the Property, except as otherwise listed in this Agreement. Buyer moreover acknowledges (i) that Buyer is a sophisticated Buyer, knowledgeable and experienced in the financial and business risks attendant to an investment in real property and capable of evaluating the merits and risks of entering into this Agreement and purchasing the Property, (ii) that Buyer has entered into this Agreement in reliance on its own (or its experts') investigation of the physical, environmental, economic and legal condition of the Property, and (iii) that Buyer is not relying upon any representation or warranty concerning the Property made by Seller or Seller's Representatives, except as otherwise listed in this Agreement. Seller shall not have any liability of any kind or nature for any subsequently discovered defects in the Property, whether the defects were latent or patent, unless specifically known to the Seller at the time of execution of this Agreement and not disclosed to Buyer. Buyer or anyone claiming by, through or under Buyer hereby fully and irrevocably releases Seller and Seller's Representatives, shareholders, officers from any and all claims that it may now have or hereafter acquire against Seller or Seller's Representatives for any cost, loss, liability, damage, expense, action or cause of action, whether foreseen or unforeseen, arising from or related to any structural, engineering or environmental condition at the Property, including without limitation the presence or absence, location or scope of any Hazardous Materials in, at, or under the Property (whether patent, latent or otherwise) as of the date of Closing, unless same was known to the Seller at the time of execution of this Agreement and was not disclosed to Buyer. Buyer further acknowledges and agrees that this release shall be given full force and effect according to each of its expressed terms and provisions, including but not limited to those relating to unknown and suspected claims, damages and causes of action. In addition, Seller shall have no responsibility to make any repairs, nor be required to secure any required certificate of occupancy, continuing certificate of occupancy, nor any other municipally required inspection or approval upon sale of property in the City of Spring Lake whatsoever; the responsibility to secure same shall rest solely with the Buyer, and securing said inspections/certificates (if any) shall in no way delay the Closing.

    4.5 <u>No Obligation to Repair or to Comply</u>. Seller shall not be obliged to make any changes, alterations or repairs to the Property prior to Closing. Buyer is solely responsible, at its sole cost and expense, for obtaining any certificate of occupancy or any other certificate, approval

or permit necessary for transfer or occupancy of or title to the Property and for making any repairs or alterations necessary to obtain same, all at Buyer's sole cost and expense.

### 4.6 Buyer's Entry and Indemnity; Limits on Government Contacts.

**(a)** In connection with any entry by any Buyer Party or any of their contractors onto the Property, Buyer shall give Seller reasonable advance notice of such entry and shall make best efforts not to disturb any of the occupants.

**(b)** Notwithstanding any provision in this Agreement to the contrary, neither Buyer nor any other Buyer Party nor any of their contractors shall contact any Governmental Authority regarding any Hazardous Materials or the environmental condition of the Property without prior notice to the Seller. Seller shall have the right to have a representative present when Buyer has, or causes to have, any such contact with any Governmental Authority.

## 5. BUYER'S CONDITIONS PRECEDENT

### 5.1 Conditions to Buyer's Obligation to Purchase.
Buyer's obligation to complete Closing is conditioned upon the satisfaction (or Buyer's written waiver) on or prior to the Closing Date of all of the following conditions (collectively, "Buyer's Conditions Precedent"):

**(a)** Seller's Representations and Warranties. The representations and warranties of Seller herein contained shall be true and correct in all material respects.

**(b)** Seller's Performance. Seller shall have performed in all material respects all Seller's agreements and obligations required by this Agreement to be performed at or prior to Closing.

**(c)** Condition of Title. At Closing, the Real Property shall not be subject to any liens or encumbrances other than the Permitted Encumbrances (subject to Article 8 of this Agreement) and Buyer shall have received a marked-up Title Insurance Commitment dated as of the Closing Date irrevocably committing the Title Company to issue an owner's title policy of insurance for the Property consistent with the foregoing.

**(d)** Force Majeure or Substantial Economic Change. There shall not have occurred any force majeure event or any substantial change in the overall economy of the United States of America.

**(e)** Retained Interest. There shall be no Seller's retained interest.

**(f)** Bankruptcy Court Approval. This Agreement, and the underlying sale of the Property to the Buyer, is subject to Bankruptcy Court approval. After the completion of Due Diligence, Seller shall move before the New Jersey Bankruptcy Court, Trenton Vicinage, for approval of this sale to Buyer. If this agreement is not approved by the Bankruptcy Court, the agreement shall terminate and the Deposit shall be returned to the Buyer in full.

5.2 <u>Failure of Conditions</u>. If at the time of Closing any Buyer's Conditions Precedent shall not have been satisfied in any material respect, then unless such lack of satisfaction has been caused by an affirmative act or omission of Seller (in which case the provisions of Section 12.1 shall apply), Buyer shall have the right (as Buyer's exclusive right and remedy) either (i) to proceed with Closing without any adjustment in the Purchase Price, in which case Buyer shall be deemed to have waived all unsatisfied Buyer's Conditions Precedent, or (ii) to terminate this Agreement by giving Seller notice on or before the Closing Date, in which case the Deposit shall be refunded to Buyer promptly, and neither party shall have any further rights, duties, liabilities or obligations under this Agreement, except as otherwise expressly set forth herein. Notwithstanding the foregoing, if such unsatisfied Buyer's Condition Precedent is susceptible of satisfaction by Seller, Seller may elect to extend the Closing Date for up to thirty (30) days in order to satisfy the unsatisfied Buyer's Condition Precedent, and in such event this Agreement shall remain in full force and effect pending the satisfaction of such Buyer's Condition Precedent. Additionally, the buyer and seller may agree to mutually extend the closing date after the 30 day period.

6. SELLER'S CONDITIONS PRECEDENT

6.1 <u>Conditions to Seller's Obligations to Sell</u>. Seller's obligation to complete Closing is conditioned upon the satisfaction (or Seller's written waiver) on or prior to the Closing Date of all of the following conditions (collectively, "Seller's Conditions Precedent"):

**(a)** <u>Purchase Price</u>. Seller shall have been paid the entire Purchase Price.

**(b)** <u>Buyer's Representations and Warranties</u>. The representations and warranties of Buyer herein contained shall be true and correct in all material respects. These representations shall not survive closing.

**(c)** <u>Buyer's Performance</u>. Buyer shall have performed in all material respects all Buyer's agreements and obligations required by this Agreement to be performed at or prior to Closing.

6.2 <u>Failure of Conditions</u>. If at the time of Closing any of Seller's Conditions Precedent have not been satisfied in any material respect, then unless such lack of satisfaction has been caused by an affirmative act or omission of Buyer (in which case the provisions of Section 12.2 shall apply), Seller shall have the right (as Seller's exclusive right and remedy) either to (i) proceed with Closing, in which case Seller shall be deemed to have waived all unsatisfied Seller's Conditions Precedent, or (ii) to terminate this Agreement by giving Buyer notice on or before the Closing Date, in which case the Deposit shall be returned to the Buyer promptly, and neither party shall have any further rights, duties, liabilities or obligations under this Agreement, except as otherwise expressly set forth herein.  There shall be no provision for liquidated damages. Notwithstanding the foregoing, if such unsatisfied Seller's Condition Precedent is susceptible of satisfaction by Buyer, Buyer may elect to extend the Closing Date for up to thirty (30) days in order to satisfy the unsatisfied Seller's Condition Precedent, and in such event this Agreement shall remain in full force and effect pending the satisfaction of such Seller's Condition Precedent.

## 7. REPRESENTATIONS AND WARRANTIES

### 7.1 Representations and Warranties of Seller.

**(a)** Except as disclosed in writing to Buyer, and subject to the provision of Sections 4.1, 4.2, 4.3 and 7.2, Seller hereby represents and warrants to Buyers that to the best of its knowledge:

(i) This Agreement and all Closing Documents to which Seller is a party (A) are, or at the time of Closing will be, duly authorized, executed and delivered by Seller, (B) do not, and at the time of Closing will not, violate any provision of any agreement to which Seller is a party or to which Seller is subject, and (C) constitute (or in the case of Closing Documents will constitute) valid and legally binding obligations of Seller, enforceable in accordance with their terms, subject to bankruptcy and other laws limiting enforceability.

(ii) Seller shall not enter into any leases without first discussing with Purchaser and obtaining Purchaser's written consent.

(iii) Seller has not received from any Person any notice of any condemnation of all or any portion of the Property.

(iv) Seller has received no notification of alleged, actual or potential responsibility for, or any inquiry or investigation regarding, any release or threatened release of Hazardous Materials or alleged violation of, or non-compliance with, any environmental statutes, ordinances or regulations affecting the Property.

(v) Seller represents that to the best of its knowledge there are no abandoned underground oil tanks on the Property.

**(b)** Each of the representations and warranties of Seller contained in this Section 7.1: (i) is made subject to the information disclosed or to be disclosed in the materials provided to Buyer prior to or during the Due Diligence Period; (ii) is made as of the Effective Date; and (iii) shall be deemed remade by Seller, and shall be true, in all material respects, as of the Closing Date (except and to the extent such representations and warranties are rendered inaccurate by any (A) information disclosed to Buyer or otherwise made known to (or discovered by) Buyer during the course of its investigations, or information of which Buyer has or reasonably should have notice, or (B) other matters approved in writing by Buyer).

### 7.2 Limitation on Claims.
The representations and warranties of Seller set forth in Section 7.1 shall not survive Closing.

### 7.3 Representations and warranties of Buyer.

**(a)** Buyer hereby represents and warrants to Seller as follows:

(i) This Agreement and all Closing Documents to which Buyer is a party (A) are, or at the time of Closing will be, duly authorized, executed and delivered by Buyer, (B) do not, and at the time of Closing will not, violate any provision of any agreement or judicial

Order to which Buyer is a party or to which Buyer or any property owned by Buyer is subject, and (C) constitute (or in the case of Closing Documents will constitute) valid and legally binding obligations of Buyer, enforceable in accordance with their terms subject to bankruptcy and other laws limiting enforceability.

(ii) No consents or approvals are required to be obtained from, and no filings are required to be made with, any Governmental Authority, lender, equity partner or other Person in connection with the execution and delivery of this Agreement by Buyer or the consummation by Buyer of the transactions contemplated hereby, other than those that have been obtained or made.

(iii) Neither Buyer nor any of its affiliates, nor any of their respective partners or members, and none of their respective officers and directors, or to Buyer's knowledge, their employees, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the OFAC of the Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not engaging in any dealings or transactions or be otherwise associated with such persons or entities.

(iv) Buyer, or any permitted assignee, are financially capable of entering into and consummating the within contemplated transaction.

**(b)** Each of the representations and warranties of Buyer contained in this Section 7.3 is made on the Effective Date, shall be deemed remade by Buyer, and shall be true in all material respects, as of the Closing Date.

8. TITLE; SURVEY

8.1 Title; Survey.

**(a)** Seller shall convey to Buyer at Closing good and marketable fee simple title to the Real Property, subject only to the Permitted Encumbrances. Buyer shall obtain a Title Insurance Commitment, at Buyer's expense, from the Title Company, and shall furnish to Seller a copy of the Title Insurance Commitment as specified in Section 6.1(c) below. Seller shall also convey clear and marketable title free and clear of all mortgages, liens and encumbrances.

**(b)** Buyer, at its sole discretion and cost, may obtain its own current survey and, if it elects to obtain a survey, shall furnish a copy of the current survey to Seller.

**(c)** Buyer shall notify Seller in writing of any matters set forth in the Title Insurance Commitment that are objectionable to Buyer (the "Objections"), which notice must be delivered to Seller on or before 5:00 P.M. (prevailing Eastern Time) within the Due Diligence Period (the "Title Exam Deadline"). (With respect to any item contained in the Title Commitment to which Buyer does not object during such period, such item shall be deemed to be a Permitted Encumbrance). Within three (3) business days following receipt of the Objections, Seller shall give written notice to Buyer of those Objections that Seller is unable or unwilling to cure (and if

Seller fails to give such written notice within three(3) business days, Seller will be deemed to have notified Buyer that Seller is unable or unwilling to cure all such Objections); provided, however, that Seller shall be obligated to cure any Objections consisting of a mortgage, mechanics lien, or other matter that can be removed or discharged by the payment of an ascertainable sum of money. The Objections that Seller is unable or unwilling to cure will be deemed Permitted Encumbrances unless Buyer shall, within three (3) business days of Buyer's receipt (or deemed receipt) of notice from Seller of those Objections that Seller is unable or unwilling to cure, terminate this Agreement, in which event the Deposit shall be returned to Buyer.

**(d)** Notwithstanding anything above to the contrary, Buyer may at any time accept such title as Seller can convey, without reduction of the Purchase Price (as hereinafter defined) or any credit or allowance on account thereof or any claim against Seller. The acceptance of the Deed (as hereinafter defined) by Buyer shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement.

9. CLOSING

9.1 Closing Date. Closing shall be held at 10:00 A.M. Eastern Time Five (5) days after Bankruptcy Court approval of this Agreement, court order or by a mutually agreed upon date and time. This Closing Date is an estimated closing date and the parties shall work in their best efforts to close on or as close to the Closing Date as possible. This is not "time is of the essence" contract of sale.

9.2 Location. The parties shall use their best effort to conduct Closing at a location convenient to the attorney of Mortgage Lender, or at a reasonably agreed upon location. Seller need not physically attend closing.

9.3 Closing Documents. On or before the scheduled Closing Date, Seller shall execute and deposit into escrow with the Title Company the following documents (where applicable, fully executed and notarized) ("Seller's Closing Documents"):

**(a)** a Bargain and Sale Deed with covenants against Grantor's acts ("Deed") for the Real Property;

**(b)** a FIRPTA Affidavit;

**(c)** a customary "gap" indemnity and owner's affidavit as the Title Company may reasonably require;

**(d)** a settlement statement approved by Buyer and Seller.

9.4 Buyer Closing Deliveries. On or before the scheduled Closing Date, Buyer shall deliver to Seller (where applicable, fully executed and notarized) ("Buyer's Closing Documents"):

**(a)** the balance of the Purchase Price, the closing cost obligations of Buyer, tax and utility adjustments, and all other fees costs that are obligations of Buyer;

**(b)** a settlement statement approved by Buyer and Seller.

9.5 <u>Closing Instructions</u>. At or prior to Closing, Buyer and Seller shall each execute and deposit in escrow with the Title Company such other instructions and documents as are reasonably required or are required by the Title Company, on the scheduled Closing Date, to: (i) pay Seller the Purchase Price, (ii) record Closing Documents, and (iii) consummate Closing in accordance with the terms hereof.

10. PRORATIONS; EXPENSES

10.1 <u>General</u>.

**(a)** Real estate taxes prorated on a tax year basis; the current installment (only) of any improvement bond, assessment or charge that is a lien on the Property or that is pending and may become a lien on the Property; water, sewer and utility charges; escrows with utility companies, Governmental Authorities or other Persons and pertaining to the Property; annual permits and/or inspection fees (calculated on the basis of the period covered); and any other income or expenses relating to the operation and maintenance of the Property shall all be prorated as of 12:01 a.m. prevailing Eastern Time on the Closing Date, on the basis of a 365-day year, pursuant to generally accepted accounting principles consistently applied (to the extent applicable), with Buyer deemed the owner of the Property on the entire Closing Date.

**(b)** Gas, water charges and sewer rents (if there be a water or gas meter on the Premises, Seller shall furnish a reading on or about the Closing Date and the unfixed gas or water meter charge and the unfixed sewer rent, if any, based thereon for the intervening time shall be apportioned on the basis of such last reading);

**(c)** Rents and other charges, as and when collected, due to Seller as landlord under the Seller's leases. If on the Closing Date there are past due rents or charges owed by tenants and Seller is entitled to all or part thereof, Purchaser agrees that with respect to then current and undisputed rentals, the first rentals and monies received by Purchaser subsequent to the Closing Date shall be first applied to current rentals and the balance (less reasonable collection charges actually incurred therefore) from such tenant or tenants shall be received in trust by Purchaser for Seller's account in payment of past due rents;

**(d)** Any other items or amounts customarily apportioned between a buyer and seller in connection with the sale and purchase of improved real property and real property containing a mixed use of tenants; and

**(e)** Seller and Purchaser agree that there shall be no apportionment of items paid directly by tenants to any utility and service provider.

11. DEFAULT

11.1 <u>Seller's Default</u>. In the event that Seller fails to consummate the transactions contemplated by this Agreement for any reason other than Buyer's default or the permitted termination of this Agreement by Seller or Buyer as herein expressly provided, Buyer, as its sole

and exclusive remedies, may (i) terminate this Agreement by written notice of termination to Seller on or before the Closing Date, whereupon the Deposit shall be returned promptly to Buyer, or (ii) pursue an action for specific performance of this Agreement, or (iii) pursue any and all other legal remedies available in the New Jersey Courts.

11.2 Buyer's Default. In the event that Buyer fails to consummate the transactions contemplated by this Agreement for any reason other than Seller's default or the permitted termination of this Agreement by Seller or Buyer as herein expressly provided, Seller shall (as its sole remedy) be entitled to pursue all remedies at law. Upon payment as required in accordance with the aforesaid, this Agreement shall be terminated without further liability or obligation on the part of any party hereto to any other party hereto arising out of this Agreement.

12. BROKERS

12.1 Brokers. Each of Seller and Buyer represents and warrants to the other that no broker or finder was instrumental in arranging or bringing about this transaction and, to each party's knowledge, there are no Claims or rights for brokerage commissions or finders' fees in connection with the transactions contemplated hereby by any Person or entity. If any Person brings a Claim for a commission or finder's fee based upon any contact, dealings or communication with Buyer or Seller, then the Party such Person is claiming through shall pay same or shall defend the other Party from such Claim, and shall indemnify and hold the other Party harmless from any and all costs, damages, claims, liabilities or expenses (including without limitation, reasonable attorneys' fees and disbursements) incurred by it in defending against the claim. The provisions of this Section shall survive the Closing or, if the Closing does not occur, any termination of this Agreement.

13. NOTICE

(a) Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "Notices") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) when transmitted by facsimile machine or email, with printed confirmation of successful transmission to the appropriate facsimile number or email address listed below as obtained by the sender from the sender's facsimile machine or email account, (c) upon receipt, when sent by prepaid reputable overnight courier or (d) three (3) days after the date so mailed if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed as follows:

Seller:

Brian G. Hannon, Esq.
Norgaard, O'Boyle & Hannon
184 Grand Avenue
Englewood NJ, 07631
(201) 871-1333

>   Fax: (201) 871-3161
>   bhannon@norgaardfirm.com

Buyer:

>   Roger A. Serruto, Esq.
>   The Serruto Law Firm, P.C.
>   60 Northfield Ave., Suite 2
>   West Orange, NJ  07052
>   (973) 736-7373 (phone)
>   (973) 736-7311 (fax)
>   rserruto@serrutolaw.com
>   ldolan@serrutolaw.com

Notices shall be valid only if served in the manner provided above. Notices may be sent by the attorneys for the respective parties and each such Notice so served shall have the same force and effect as if sent by such party.

14. MISCELLANEOUS

14.1 Recording. This Agreement shall not be recorded or otherwise filed or made a matter of public land or lien records.

14.2 Joint Undertaking. In addition to the obligations expressly required to be performed hereunder by Seller and Buyer, each party agrees to cooperate with the other and to perform such other acts and to execute, acknowledge and deliver, prior to and after Closing, such other instruments, documents and materials as a party may reasonably request and as shall be necessary in order to effect the consummation of the transactions contemplated hereby; provided that no such other instrument, document or material shall either extend or enlarge the obligations of the non-requesting party beyond the express undertakings of this Agreement or shall require or could require the non-requesting party to make any payment or expend any funds which are not expressly provided for herein or which the requesting party shall not reimburse. This Section shall survive Closing.

14.3 Whole Agreement; Amendments. This Agreement sets forth all of the agreements, representations, warranties and conditions of the parties hereto with respect to the subject matter hereof, and supersedes all prior or contemporaneous agreements, representations, warranties and conditions. The schedules, exhibits and/or riders referred to herein constitute parts of this Agreement. No alteration, amendment, modification or waiver of any of the terms or provisions hereof, and no future representation or warranty by either party with respect to this transaction, shall be valid or enforceable unless the same be in writing and signed by the party against whom enforcement of same is sought.

14.4 Counterparts; Facsimiles. This Agreement may be executed by the parties hereto in any number of separate counterparts, all of which, when delivered, shall together

constitute one and the same Agreement. Facsimile and pdf signatures shall be deemed to be delivered, legal and binding.

14.5 <u>Governing Law</u>. This Agreement and all issues arising hereunder shall be governed by the laws of the State of New Jersey.

14.6 <u>Waiver of Trial by Jury</u>. TO THE EXTENT PERMITTED BY LAW, EACH PARTY HEREBY WAIVES, IRREVOCABLY AND UNCONDITIONALLY, TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED IN CONNECTION HEREWITH, THE PROPERTY, OR ANY CLAIMS, DEFENSES, RIGHTS OF SET-OFF OR OTHER ACTIONS PERTAINING HERETO OR TO ANY OF THE FOREGOING.

14.7 <u>No Third Party Beneficiary</u>. Except and to the extent of provisions hereof that expressly deal with Seller Parties and Buyer Parties, the provisions of this Agreement are not intended to benefit any Person not a party hereto.

14.8 <u>Severability</u>. If any provision of this Agreement, or the application thereof to any Person, place or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable or void in any respect, the remainder of this Agreement and such provisions as applied to other Persons, places and circumstances shall remain in full force and effect.

14.9 <u>Consents</u>. Unless expressly provided otherwise herein, any consent, determination, election or approval required to be obtained, or permitted to be given, by or of any party hereunder, shall be granted, withheld or made (as the case may be) by such party in the exercise of such party's sole and absolute discretion.

14.10 <u>Acceptance</u>. This Agreement shall not be valid or binding unless and until it is fully executed by Seller and Buyer.

14.11 <u>Drafts not an Offer to Enter into a Legally Binding Contract</u>. The submission of a draft, or a marked up draft, of this Agreement by one party to another is not intended by either party to be an offer to enter into a legally binding contract with respect to the purchase and sale of the Property. The parties shall be legally bound with respect to the purchase and sale of the Property pursuant to the terms of this Agreement only if and when the parties have been able to negotiate all of the terms and provisions of this Agreement in a manner acceptable to each of the parties in their respective sole discretion, including, without limitation, all of the Exhibits and Schedules hereto, and each of Seller and Buyer have fully executed and delivered to each other a counterpart of this Agreement, including, without limitation, all Exhibits and Schedules hereto.

14.12 <u>Holidays</u>. Wherever this Agreement provides for a date, day or period of time on or prior to which action or events are to occur or not occur, and if such date, day or last day of such period of time falls on a day that is not a Business Day, then the applicable date shall be deemed to fall on the immediately following Business Day.

SELLER: John M. McDonnell Chapter 7 Trustee
for the Estate of John M. Reynolds

By: _____
Name:

BUYER:

By: _____
Name:

EXHIBIT A

DESCRIPTION OF LAND

# REPORT OF TITLE – RECORD OWNER SEARCH

(No Insurance, Record Owner County Search with document copies from search period,
1 Tax Search included, 2 upper Court Searches included)

File Number: **026-221665**

## LEGAL DESCRIPTION

All that certain tract or parcel of land, situated, lying and being in Spring Lake Borough, County of Monmouth, and State of New Jersey, more particularly described as follows:

TRACT NO. 1

BEGINNING at a point in the Southwesterly line of Howell Avenue distant Southeasterly sideline 92.95 feet measured thereon from the intersection of the Southwesterly line of Howell Avenue with the Southerly line of South Boulevard and running: thence

(1) Southeasterly along the Southwesterly line of Howell Avenue on a course of South 40 degrees 00 minutes 20 seconds East 100.21 feet to a point in theSouthwesterly line of Howell Avenue; thence

(2) Southwesterly at right angles to Howell Avenue on a course of South 49 degrees 59 minutes 30 seconds West, 150 feet to a point; thence

(3) Northwesterly parallel with Howell Avenue on a course of North 40 degrees 00 minutes 30 seconds West 100.21 feet to a point; thence

(4) Northwesterly at right angles to the last course North 49 degrees 59 minutes 30 seconds East, 150 feet to the Southwesterly line of Howell Avenue and the point and place of BEGINNING.

TRACT NO. 2

BEGINNING at a point located in the Southwesterly line of Howell Avenue, said point being distant 226.07 feet from the intersection of the above mentioned line with the Southerly line of South Boulevard and running; thence

(1) South 40 degrees 00 minutes East along the Southwesterly line of Howell Avenue a distance of 17.00 feet to a point; thence

(2) South 50 degrees 00 minutes West a distance of 150.00 feet to a point; thence

(3) North 40 degrees 00 minutes West a distance of 17 feet to a point; thence

(4) North 50 degrees 00 minutes East a distance of 150.00 feet to a point; thence

TRACT NO. 3

BEGINNING at a point located in the Southwesterly line of Howell Avenue, said point being distant 193.07 feet from the intersection of the above mentioned line with the Southerly line of South Boulevard and running; thence

(1) South 40 degrees 00 minutes East along the Southwesterly line of Howell Avenue.a distance of 33.00 feet to a point; thence

(2) South 50 degrees 00 minutes West a distance of 150.00 feet to a point; thence

(3) North 40 degrees 00 minutes West a distance of 33,00 feet to a point; thence

(4) North 50 degrees 00 minutes East a distance of 150.00 feet to the point and place of BEGINNING.

BEING known as 221 Howell Avenue, Spring Lake Borough, Monmouth County, State of New Jersey, Block 146, Lot 10 on the tax map of Spring Lake Borough.

NOTE: Lot and Block shown for informational purposes only.